UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES SECRETARY OF THE INTERIOR,<br><br>Defendant. | Case No. 4:08-cv-00508-EJL-LMB<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

This action is a challenge to the U.S. Fish and Wildlife Service's ("FWS") 90-day finding concerning the Columbian sharp-tailed grouse (*Tympanuchus phasianellus columbianus*). *90 Day Finding on a Petition to List the Columbian Sharp-tailed Grouse as Threatened or Endangered*, 71 Fed. Reg. 67,318 (Nov. 21, 2006) ("Finding"). The Finding by FWS denied designation of the Columbian sharp-tailed grouse for protection as a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. Plaintiffs appealed the Finding arguing that the Secretary failed to adequately account for the bird's loss of historic range. The Secretary counters that Plaintiffs lack

standing to sue, and that regardless, he fulfilled his obligations under the ESA and the Administrative Procedures Act ("APA").

Currently pending before the Court is Plaintiffs' *Motion for Summary Judgment* (Docket No. 35) and Defendant's *Cross-motion for Summary Judgment* (Docket No. 46) referred to the undersigned for a Report and Recommendation by Order dated April 23, 2009 (Docket No. 15).

## BACKGROUND

### A.  The Columbian Sharp-tailed Grouse

The Columbian Sharp-tailed Grouse ("Grouse" or "CSTG") is a subspecies of the sharp-tailed grouse, native to the western United States and western Canada. Their plumage is grayish-brown, with black and white markings and a white wedge-shaped tail. "The historical range of the Columbian Sharp-tailed Grouse extended from the steppe and shrub-dominated habitats in the inter-mountain regains from British Columbia south to California, Nevada, and Utah, and east to western Montana, Wyoming and Colorado." (AR 203, 2). Essentially, the historic range refers to the CSTG's estimated distribution before human activities affected CSTG populations.

Today, human activities have extirpated the CSTG from the majority, over 90 percent, of its historic range. Approximately 95 percent of the current CSTG population exist in one of three unconnected meta-populations located in central British Columbia, southeastern Idaho/northern Utah, and northwestern Colorado/south-central Wyoming. The remaining five percent of CSTG reside in smaller, isolated populations throughout

**REPORT AND RECOMMENDATION - 2 -**

central British Columbia, southeastern Idaho, northwestern Colorado and south-central Wyoming. It is undisputed that the CSTG's current range is less than ten percent of its historic range.

## STATUTORY FRAMEWORK

**A.     Endangered Species Act**

The Endangered Species Act ("ESA" or "the Act") was enacted "to provide a program for the conservation of . . . endangered species and threatened species," and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1533(b). Whether or not a particular species should be listed as "endangered" or "threatened" is determined by a process set forth in the Act, 16 U.S.C. § 1533.[1]

Usually, a listing occurs in response to a petition filed by an interested party. *See* 16 U.S.C. § 1533(b)(3)(A). When such a petition is filed, the Secretary must, "[t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person . . . make a finding ("90-day finding") as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id*. Substantial information is the "amount of information that would lead a reasonable person to believed that the measures proposed in the petition may be

---

[1] An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

warranted." 50 C.F.R. § 424.14(b). At the 90-day stage, [i]t is the petitioner's burden to provide the Service with the necessary substantial scientific or commercial information ("substantial information"). *Western Watersheds Project v. Norton*, No. 06-00127-S-EJL, 2007 WL 2827375, at *2 (D. Idaho Sept. 26, 2007) (Lodge, J.) ("*Norton*") (*citing* 16 U.S.C. § 1533(B)(3)(a); 50 C.F.R. § 424.14(b)); *see also Western Watersheds Project v. Hall*, No. 06-0073-S-EJL, 2007 WL 2790404, at *4 (D. Idaho Sept. 24, 2007) (Lodge, J.) ("*Hall*"). FWS does not conduct additional research at the 90-day stage. *Norton*, 2007 WL 2827375, at *7-8; *see also Hall*, 2007 WL 2790404, at *6.

FWS regulations define substantial information as that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted. 50 C.F.R. §424.14(b)(1). In making a determination on the petition, FWS is to consider whether the petition:

> (i) Clearly indicates the administrative measure recommended and gives the scientific and any common name of the species involved;
>
> (ii) Contains detailed narrative justification for the recommended measure, describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species;
>
> (iii) Provides information regarding the status of the species over all or a significant portion of its range; and
>
> (iv) Is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps.
>
> The petitioner may provide information that describes any recommended critical habitat as to boundaries and physical features, and indicates any benefits and/or adverse effects on the species that would result from such

designation. Such information, however, will not be a basis for the determination of the substantiality of a petition.

50 C.F.R. § 424.14(b)(2). If the 90-day finding concurs with the petition, the Secretary must undertake a status review of the species and, within one year, issue a 12-month finding concluding whether the petition is warranted, not warranted, or warranted but precluded. 16 U.S.C. § 1533(b)(3)(B). Where, as is the case here, the 90-day finding is negative as to the petition's request, the listing (or delisting) process is at an end and the aggrieved party may seek judicial review of the Secretary's ultimate determination. 16 U.S.C. § 1533(b)(3)(C)(ii).

Under the ESA, the Secretary must list as either threatened or endangered any species facing extinction or imperilment due to any one, or any combination of, the following five factors:

1. The present or threatened destruction, modification, or curtailment of the species' habitat or range;

2. overutilization for commercial, recreational, scientific, or educational purposes;

3. disease or predation;

4. the inadequacy of existing regulatory mechanisms; or

5. other natural or manmade factors affecting the species' continued existence.

16 U.S.C. §§ 1533(a)(1)(A)-(E); *see Norton*, 2007 WL 2827375, at *3. The FWS's negative 90-day finding is subject to judicial review under the APA. *Northwest Ecosystem Alliance v. United States Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir.

2007).

**B.     Administrative Procedure Act**

"The [APA] governs judicial review of administrative decisions involving the Endangered Species Act." *Aluminum Co. of America v. Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir. 1999). Where a court conducts judicial review pursuant to the APA, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Engineering Co. v. Immigration and Naturalization Service*, 753 F.2d 766, 770 (9th Cir. 1985).

Pursuant to the APA, the Court may reverse the FWS Finding only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), *Northwest Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1047 (9th Cir. 2008) (*quoting* 5 U.S.C. § 706(2)(A)). The arbitrary and capricious standard is highly deferential, and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). Review is "based upon the evidence contained in the administrative record." *Arizona Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1245 (9th Cir. 2001). Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980).

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard is 'highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision.'" *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (*quoting Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). Review under this standard is "exacting, yet limited"; a court "may not substitute [its] judgment for that of the agency." *Id.*

This is not to say that the Agency has limitless discretion. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010) (*quoting Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). A reviewing court "must not rubber-stamp . . . administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005).

C. **Standard of Review**

REPORT AND RECOMMENDATION - 7 -

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The claims in this case involve FWS's issuance of a biological opinion, which is a final agency action subject to judicial review under the APA, 5 U.S.C. § 702. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 925 (9th Cir. 2008). A court conducting judicial review under the APA may not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006) (*quoting Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

> According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989) (*citation omitted*). Of course, at this stage , "evidence must be construed in the light most favorable to the party opposing summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

Under the APA, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and

otherwise consistent with the APA standard of review." *Id*. at 90. In other words, the Court's role is to determine whether the Service's CSTG decision comports with the ESA and the APA. *See, e.g., Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The Court's directive is to:

> reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem,'or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. (internal citations omitted).

## DISCUSSION

Essentially, there are two issues in contention. First, Defendant argues that Plaintiffs lack standing. Plaintiffs maintain that the three affidavits they submitted provide ample facts to establish standing and advance to a decision on the merits. Further, Wildearth argues that, as a matter of law, FWS's Finding was arbitrary and capricious because is failed to adequately account for the extirpation of the CSTG from greater than 90 percent of its historic range.

**A.   Standing**

Defendant contends that Plaintiffs failed to establish Article III standing. At the summary judgment stage, a plaintiff cannot rest on mere allegations of injury, but must provide affidavits or other evidence demonstrating that he or she has standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992). Plaintiffs attached three affidavits from members of their organizations. Defendant contends that two of the affidavits are

**REPORT AND RECOMMENDATION  - 9 -**

un-executed and thus inadmissable. (Decs. of Mark N. Salvo and Kathleen Fite, Docket Nos. 35-4, 35-5). Defendant further argues that the third affidavit fails to demonstrate an injury in fact with sufficient specificity. (Dec. of Jeremy Nichols, Docket No. 35-3).

Specifically, with regard to the third affidavit, by Jeremy Nickhols (Docket No. 35-3), Defendant questions if Nichols describes the proper bird, noting that parts of Nichols's affidavit describe a "sharp-tailed grouse," not a "*Columbian* sharp-tailed grouse." Further, Defendant challenges both the concreteness of the Nichols's future plan to visit the area, and if the description of the area he is planning on visiting is even populated by CSTG.

As an initial matter, at oral arguments, Defendant stipulated that, for purposes of establishing standing only, the Salvo and Fite affidavits were properly executed, thus dropping its only criticism of those affidavits.[2] The Court further is of the opinion, as explained below, that the Fite affidavit satisfactorily establishes standing alone, which renders Defendant's issues raised with regard to the Nichols affidavit moot.

Organizations such as Plaintiffs have standing to bring an action on behalf of its members where: (1) the organization's members would have standing to sue individually; (2) the organization is seeking to protect interests that are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the organization's members to

---

[2] In any case, the Court views the affidavits as properly executed. This Court frequently accepts and transmits court documents with electronic signatures. *See also* 15 U.S.C. § 7006 ("The term "electronic signature" means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record.")

participate in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). The parties do not dispute that Plaintiffs satisfy the second and third prongs of the *Hunt* test.

In order to establish individual standing, "[a] plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The Fite affidavit satisfies the standing factors: (1) Fite, as a Plaintiff employee, professional ecologist, camper, hiker, wildlife photographer and bird-watcher has a personal protectable interest sufficient for standing; (2) Plaintiffs have already detailed that the negative 90-day finding will hinder recovery efforts; and (3) reversal of that finding will redress Fite's harm.

Moreover, Fite's declaration established, with adequate detail,[3] past and intended future use of some of the disputed land, the CSTG's range, and the particular harm to that activity, namely an inability to enjoy seeing the Grouse in its natural habitat. The injuries asserted satisfy the *Lujan* requirements.

Plaintiffs assert that their cognizable interest in protecting CSTG is harmed by FWS's arbitrary decision, and that a favorable decision by this Court would remedy that

---

[3] Though Fite only describes an intent to visit and view the CSTG in "summer 2010," this plan is concrete enough for standing purposes. The Court agrees with Plaintiffs' reasoning that individuals that live in such close proximity to wilderness areas often plan seasonally for a variety of reasons, including the sheer ease of access or inclimate weather concerns.

injury by requiring the agency to reconsider its listing decision in a non-arbitrary manner. The Salvo and Fite affidavits adequately support this assertion. The Court is of the opinion that the Plaintiffs have satisfied the constitutional minimum requirements.

**B.     FWS's Finding**

   **1)     Best Available Scientific Data**

Under the ESA, the Secretary's actions must be based on the " best scientific and commercial data available to him after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A). However, this requirement does not obligate FWS to conduct new, independent studies. *See Southwest Center for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C.Cir. 2000) (finding no obligation under the ESA to conduct new research).

In adopting a standard of the "best scientific and commercial data" and not a standard of absolute certainty, Congress makes clear its intent that the FWS take conservation measures before a species is "'conclusively' headed for extinction." *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 680 (D.D.C.1997). "The Service may not base its listings on speculation or surmise or disregard superior data, . . . but absent superior data . . . occasional imperfections do not violate" ESA's requirement that FWS use the best available data. *Bldg. Ind. Ass'n of Sup. Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C.Cir. 2001).

The Court's review of the scientific data contained in the administrative record is

limited to an inquiry as to whether the record supports the agency's findings and whether the agency's actions were based on the best scientific data available to it. This Court is not in a position to make policy judgments based on conflicting or uncertain scientific data. "[W]here there are competing expert opinions, '[i]t is the prerogative of [the Secretary] to weigh those opinions and make a policy judgment based on the scientific data.'" *Brower v. Daley*, 93 F.Supp.2d 1071, 1082-83 (N.D.Cal. 2000).

2) **Historic Range**



The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). There is no dispute that the CSTG's historic range one time in the past widely distributed throughout much of the western United States and Canada, west of the continental divide, north of the Mojave Desert, and largely into what are now the states of Washington, Oregon, Califonia, Nevada, Utah, Wyoming, Colorado, Montana, Idaho and British Columbia. It is also undisputed that the CSTG's population decline is due largely

**REPORT AND RECOMMENDATION - 13 -**

to human activities, with the most severe impact on CSTG habitat during the late 1800's through the mid 1900's. (AR1, 7).

Plaintiffs argue that the FWS Finding failed to properly evaluate the extirpation of the CSTG across a significant portion, over 90 percent, of their range. Plaintiffs claim FWS erred because it did not consider the CSTG's historic range, most of which grouse no longer occupies. Defendant contends that it has fulfilled its obligations under the APA because it reviewed all of the information submitted by Plaintiffs as well as information contained in agency files. Defendant concludes that FWS correctly rejected the petition at the 90-day stage because it lacked any information on the biological significance of the unoccupied portions of the subspecies' historical distribution. The Service concludes that it properly applied a rational interpretation of an ambiguous statutory provision ("significant portion of its range) that is entitled to deference. The Secretary points out finally that Grouse population "has, if anything, increased since 2000."

Due to the ambiguity of the phrase "significant portion of its range," the agency is entitled to deference in its interpretation of the term if the agency articulates a reasoned basis for its decision and articulates a rational connection between the facts and the decision it has made. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984), *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001). The Ninth Circuit has interpreted this statutory phrase as follows:

> We conclude, consistently with the Secretary's historical practice, that a species can be extinct "throughout ... a significant portion of its range" if there are major geographical areas in which it is no longer viable but once was.

> Those areas need not coincide with national or state political boundaries, although they can. The Secretary necessarily has a wide degree of discretion in delineating "a significant portion of its range," since the term is not defined in the statute.

*Defenders of Wildlife*, 258 F.3d at 1145. In *Defenders of Wildlife*, the Ninth Circuit reversed a decision that declined to list the flat-tailed horned lizard as threatened because the agency had not adequately considered the "significant portion of its range" language. In that case, the horned lizard was extirpated from a large percentage of its historical range and faced continuing threats on private land. *Id*. at 1138. Regardless, the agency found that the horned lizard's current range on public land was sufficient to prevent listing. *Id*. at 1138, 1140.

In that case, the Ninth Circuit Panel rejected the Secretary's argument that he could examine only current range on public land. However, the Court also rejected Defenders' assertion that a species should be listed merely because it no longer inhabits a high percentage of its historical range. The Court explained,

> it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of suitable habitat.

*Id*. at 1143. The Court granted, however, that if a species has lost a large portion of its historical range, the agency "must at least explain [the] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Id*. at 1145

(*citing Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980)).[4]  Applying similar reasoning, the *District Court in Center for Biological Diversity v. Norton*, 411 F.Supp.2d 1271 (D.N.M. 2005), upheld the Agency's determination to not list the Rio Grande Cutthroat Trout based in part on the agency's interpretation of a "significant portion of its range." *Id*. at 1283.  There, the Court found the Agency's interpretation reasonable, concluding that even if "lost habitat may be numerically or geographically large" it may not be "biologically significant because the species' survival is not threatened by the shrinkage in habitat." *Id*.

In reviewing such petitions, the Service determines that the proportion of range over which species populations are imperiled is "significant" based on scientific evidence and other factors that indicate the importance of the range to survival and the preservation of the ecosystem.  (AR 158, 2405–07).  Significance is not based on any present or quantitative measurement of range. (AR 1, 6).

Here, the 90-day Finding states,"[t]he petition does not provide substantial information suggesting that the portion of the range where the subspecies no longer occurs is significant to the long-term persistence of the subspecies."  (AR 1, 7).  FWS concludes that it is not, and explains that it "made this determination based on a

---

[4] The Court recognizes that *Defenders of Wildlife*, *supra*, is not directly comparable or applicable because it concerns the adequacy of a final listing determination, whereas this action relates to a 90-day finding.  At the 90-day stage, the Agency's review is limited to the information contained in the petition.  *Norton*, 2007 WL 2827375, *see also* section (V)(D), *infra*.  This is not to say, however, that the FWS is relieved of its duty to properly explain its conclusion.

combination of factors." (AR 1, 7-8).  First, it reasoned that "the extent of habitat outside the three metapopulations is small relative to the overall range of the subspecies, roughly 4 percent of the subspecies' current occupied range."  *Id*.  Next, FWS explains that "there is no scientific evidence suggesting that the small, isolated populations of Columbian sharp-tailed grouse are genetically, behaviorally, or ecologically unique, or that they contribute individuals to other geographic areas through emigration."  *Id*.  Finally, the Finding states that "there is no scientific evidence suggesting that these habitats are important to the survival of the species because of any unique contribution to the species' natural history, e.g., for reasons such as feeding, migration, or wintering."  *Id*.

    Plaintiff criticizes the Finding because, in determining what portion of the range is significant, the FWS did not consider that the CSTG has been extirpated from over 90 percent of its historic range.  Defendant argues that this lack of detail in the FWS Finding was due to Plaintiffs' failure to provide the FWS with scientific evidence that historic range where the CSTG no longer populates is significant to the long-term persistence of the subspecies.  Further, Defendant compare Plaintiffs' historic range argument to the quantitative approach already rejected by the Ninth Circuit in *Defenders of Wildlife*, 258 F.3d at 1143.  Defendant states that Petitioner has failed to submit any information regarding the effect of the historic rage loss.  Either because of, or in spite of, the lack of information concerning the historic range, FWS concluded that the habitat loss is not be significant if the three meta-populations of CSTG remain un-threatened, which the Finding concludes is likely.

**REPORT AND RECOMMENDATION  - 17 -**

### 3) Burden

It is undisputed that it is petitioner's burden to provide the FWS with a petition containing substantial information to warrant listing. At the 90-day finding stage, the agency may only consider information within the four corners of the petition. *See Center for Biological Diversity v. Morgenweck*, 351 F.Supp.2d 1137, 1143 (D. Colo. 2004) ("FWS's consideration of outside information and opinions provided by state and federal agencies during the 90-day review was over inclusive of the type of information the ESA contemplates to be reviewed at this stage."); *Hall*, 2007 WL 2790404 at *6 ("It was improper for the Service to make an outside solicitation or inquiry about the Petition and consider the responses when making its 90-Day Finding); *Norton*, 2007 WL 2827375, at *7 (D.Idaho Sept.26, 2007) ("[C]onsidering information outside of the four corners of the petitions impermissibly expanded the scope of the 90-day review"); *Kempthrone*, 2007 WL 16322 at *4 ("The 'may be warranted' standard, however, seems to require that in cases of such contradictory evidence, the Service must defer to information that supports petition's position. It would be wrong to discount the information submitted in a petition solely because other data might contradict it.").

The Court has conducted a careful review of the listing petition and found precious little information relating to the significance of the mass extirpation of the CSTG from its historic range. Specifically, the Court sought to locate biologically significant information relating to the CSTG's extirpation from its historic range. *See* 50 C.F.R. § 424.14(b).

In reviewing the administrative record, the Court was able to locate numerous references to the large-scale loss of range when compared to historic levels. Especially when considering some of the materials submitted by Dr. Bart, the CSTG's outlook may lead to a conclusion that survival without protection looks grim. (AR 158, 2399) ("Among all the species [the Columbia Basin Ecosystem Management Project] rated, CSTG has the second lowest probability of persistence.") Regardless, the Court was unable to locate any information regarding the significance of the large-scale extirpation, other than it has occurred. Since FWS is not permitted at the 90-day finding stage to go beyond what is provided by the petition and what is currently available in its files, the agency appropriately declined to speculate about the potential significance of the unoccupied portion of the CSTG's historic range.

The Court need not make estimates or speculate about the significance of the unoccupied portions of the CSTG's range. The Court should not substitute its judgment for that of the FWS in this regard. Further, the Court need not make a determination on the merits regarding whether the geographic scope of the listing of Columbian Sharp-tailed Grouse is at this stage of the proceedings. It is well settled that the Court only needs to determine whether the FWS's denial of Plaintiff's petition was arbitrary and capricious. An agency rule is generally considered arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, the FWS relied upon proper evidence and adequately explained its

determination, to the extent allowable given the information contained in the petition. The court is of the opinion that Defendant followed the statutory scheme for the 90-day review of Plaintiff's petition and that the Secretary's rejection of Plaintiff's petition was within the bounds of the APA and ESA.

## RECOMMENDATION

For the foregoing reasons, and upon careful consideration of the entire record in this case, the Court is of the view that the FWS's listing determination for the CSTG reflects a reasoned assessment of the statutory listing factors based on the best available scientific evidence. Accordingly, it is hereby RECOMMENDED:

1. Plaintiffs' Motion for Summary Judgment (Docket No. 35) be DENIED; and

2. Defendant's Cross-Motion for Summary Judgment (Docket No. 46) be GRANTED.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1 and that the failure to do so may result in that party waiving the right to raise factual and/or legal objections in the Ninth Circuit Court of Appeals.

DATED: **February 11, 2011**.

Honorable Larry M. Boyle
United States Magistrate Judge