UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES SECRETARY OF THE INTERIOR,<br><br>　　　　　　Defendant. | Case No. 4:08-CV-00508-EJL-LMB<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION** |

　　　　On February 11, 2011, United States Magistrate Larry M. Boyle issued his Order and Report and Recommendation in this matter. Dkt. No. 57. Pursuant to 28 U.S.C. § 636(b)(1), the parties had fourteen days in which to file written objections to the Report and Recommendation. On February 28, 2011, Plaintiffs Wildearth Guardians and Wester Watersheds Project filed their Objections to Report and Recommendation. Dkt. No. 58. Defendant Ken Salazar filed his response to Plaintiffs' objection on March 14, 2011. Dkt. No. 59.

**ORDER - 1**

## Standard of Review for Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." Moreover, this Court "shall make a de novo determination of those portions of the report which objection is made." *Id.* In *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003), the court interpreted the requirements of 28 U.S.C. 636(b)(1)(C):

> The statute [28 U.S.C. § 636(b)(1)(C)] makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise. As the *Peretz* Court instructed, "to the extent de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties." *Peretz*, 501 U.S. at 939, 111 S.Ct. 2661 (internal citation omitted). Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct. *See Ciapponi*, 77 F.3d at 1251 ("Absent an objection or request for review by the defendant, the district court was not required to engage in any more formal review of the plea proceeding."); *see also Peretz*, 501 U.S. at 937-39, 111 S.Ct. 2661 (clarifying that de novo review not required for Article III purposes unless requested by the parties) . . . .

*See also Wang v. Masaitis*, 416 F.3d 993, 1000 & n.13 (9th Cir. 2005). In this case, the Secretary does not object to the Report and Recommendation's legal conclusion the Plaintiffs have standing to bring this action. Accordingly, the Court will address only the objected to portions of the Report and Recommendation.

## Factual Background

Plaintiffs challenge the United States Fish and Wildlife Service's ("FWS") denial of their request for FWS to list the Columbian sharp-tailed grouse ("CSTG") as an endangered species pursuant to the Endangered Species Act, 16 U.S.C. §§ 1533 - 1544.

ORDER - 2

The CSTG is a subspecies of the sharp-tailed grouse, native to the western United States and western Canada. "The historical range of the Columbian Sharp-tailed Grouse extended from the steppe and shrub-dominated habitats in the inter-mountain regains from British Columbia south to California, Nevada, and Utah, and east to western Montana, Wyoming and Colorado." (AR 203, 2).[1] The historic range refers to the CSTG's estimated distribution before human activities affected CSTG populations. Report and Recommendation at p.2.

It is undisputed by the parties that human activities have extirpated the CSTG from the majority, over 90 percent, of its historic range as represented in the chart on page 13 of the Report and Recommendation. Stated another way, the CSTG's current range is less than ten percent of its historic range.

It is also undisputed that approximately 95 percent of the current CSTG population exist in one of three unconnected metapopulations located in central British Columbia, southeastern Idaho/northern Utah, and northwestern Colorado/south-central Wyoming. The remaining five percent of CSTG reside in smaller, isolated populations throughout central British Columbia, southeastern Idaho, northwestern Colorado and south-central Wyoming.

One method for requesting listing of a species as an endangered species is for an

---

[1] The Court will cite to the Administrative Record (Dkt. No. 17, DVD) by using the abbreviation "AR" followed by the pdf document number from the index of the AR, then the page number within the pdf document.

interested party to file a petition with the applicable federal agency. 16 U.S.C. § 1533(b)(3)(A). When such a petition is filed, the Secretary of the Interior ("Secretary'), in this case Defendant Ken Salazar, has 90 days after receiving the petition to make a finding ("90-day finding") as to whether the petition presents substantial scientific or commercial information indicating the petitioned action may be warranted. *Id.* If the 90-day finding determines there is substantial information that listing is warranted, the agency proceeds with a more comprehensive study of the species and issues a 12-month finding either supporting or denying the request to list the species as endangered or threatened. 16 U.S.C. § 1533(b)(3)(B). If the 90-day finding does not find substantial information to warrant listing and is negative towards the request to list the species, the process ends. 16 U.S.C. § 1533(b)(3)(C)(ii). The regulations define "substantial information" as "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1).

In this case, it important to understand the history of considering the CSTG as an endangered species in order to address the objections regarding the burdens of persuasion. In 1995, FWS received a petition from Biodiversity Law Foundation ("BLF") to formally list the CSTG. In 1999, FWS determined the BLF's petition provided "substantial information" that listing may be warranted. Based on the findings of the 90-day finding, FWS began the 12-month finding process which included a comprehensive review of the CSTG. FWS relied, at least in part, on the research of biologist Dr. Jonthan Bart, who

found the three metapopulations of CSTG did not require protection under the ESA and that listing the CSTG would probably lead to negative reactions by landowners which would impede recovery efforts. Therefore, in 2000, FWS issued its 12-month finding the CSTG did not warrant listing.

In October of 2004, Plaintiffs filed a petition requesting FWS list the CSTG as endangered. As part of the petition, Plaintiffs requested FWS to consider listing the CSTG on an emergency basis. In January of 2005, without completing a 90-day finding on the petition due to other agency priorities, FWS informed Plaintiffs that an emergency listing did not appear warranted given the 2004 petition presented little new information that was not addressed in the 12-month-finding issued in 2000. FWS also noted that Plaintiffs' data indicated that the CSTG discrete populations, including the three metapopulations, had either remained stable or possibly increased since 2000. Plaintiffs filed their notice of intent to sue based on the failure to complete a 90-day finding and later filed a complaint in federal court. The parties reached a stipulated agreement that FWS would conduct a 90-day review. On November 6, 2006, Plaintiff supplemented their 2004 petition. FWS claims the neither the 2004 petition nor the supplemental materials contain substantial information about the biological significance of the unoccupied portion of the CSTG historic range and the impact of the reduction of the historic range on the continued viability of the CSTG. On November 21, 2006, FWS published in the Federal Register its 90-day-finding on the Plaintiffs' supplemented 2004 petition and denied the request to list the CSTG.

> **Finding:**
>
> We have reviewed the petition and literature cited in the petition, and evaluated that information in relation to other pertinent information available in our files. The two main causes for historic declines of Columbian sharp-tailed grouse, (1) loss and degradation of habitats and (2) over-hunting, occurred in the early 1900s. At present, these factors occur at much reduced levels, or not at all, within the areas currently occupied by Columbian sharp-tailed grouse populations. The subspecies' metapopulations have persisted for the last several decades with no discernable downward trend, and recent information indicates they may now be increasing, along with the habitats available to them (Bart 2000, p. 9).
>
> After review of the best scientific and commercial information available, we conclude that substantial information has not been presented to indicate that listing the Columbian sharp-tailed grouse as a threatened or endangered species may be warranted.
>
> Although we are not commencing a new status review in response to this petition, we will continue to monitor the subspecies' population status and trends, potential threats, and ongoing management actions that might affect the Columbian sharp-tailed grouse.
>
> We encourage interested parties to continue to gather data that will assist with conservation of the subspecies. If you wish to provide information regarding the Columbian sharp-tailed grouse, you may submit your information or materials to the Field Supervisor, Upper Columbia Fish and Wildlife Office (see ADDRESSES section above).

(AR 1, 8).

By denying the petition, the FWS did not have to complete a 12-month study. In the November 21, 2006 90-day finding, FWS noted that the 2000 12-month finding had concluded the CSTG three metapopulations remained stable, were considered secure for the foreseeable future, and that the 2004 petition and supplement had not presented new information indicating the level of threat to the three metapopulations had changed significantly since 2000. (AR 1).

ORDER - 6

This Court may reverse the FWS negative 90-day finding only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This Court adopts by reference Judge Boyle's discussion of the limits of judicial review under the Administrative Procedures Act ("APA") on pages 6-9 of the Report and Recommendation.

## Analysis of Objections

Plaintiffs admit in their objections that they agree with over 90% of the Report and Recommendation, but they object to the burden of proof placed on petitioners at the 90-day finding stage. In their challenge to FWS denial of the 2004 supplemented petition, Plaintiffs claim that because they provided evidence (and it is undisputed) that the CSTG is absent from over 90% of its historic habitat range, the Secretary (not the petitioners) has the burden to show through valid scientific evidence that the lost of 90% of the historic range is not biologically significant to the long-term survival of the CSTG. The Secretary maintains it is the petitioners' burden to provide substantial information in their petition to support further study or listing of a species at the 90-day finding stage.

The Court has reviewed the record in this matter and finds Plaintiff's argument regarding the applicable burden is misplaced. Plaintiffs direct the Court to *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) for the proposition that the Secretary must explain his conclusions "that the area in which the species can no longer live is not a 'significant portion of its range.'" The problem in trying to apply this case to

the present case is that the species at issue are at two completely different stages of designation under the ESA. The lizard in *Defenders of Wildlife* had been designated by the Secretary to Category 1 which includes species "for which the Service has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposed rule" for protection. *Id.* at 1138. The Secretary then decided to withdraw the lizard's Category 1 status based on a Conservation Agreement and other factors and the Ninth Circuit held the Secretary had not met her statutory burden.

In the current case, the CSTG has not been proposed for listing under the ESA by FWS. The standard for removing a species designated as in need of protection would be different than the standard for determining whether an interested party's petition for listing warrants further review or listing of the species under the ESA as endangered or threatened. Case law allows the Secretary to place the burden on the petitioners to show substantial information to warrant listing within the four corners of their petition. *Center for Biological Diversity v. Morgenweck*, 351 F.Supp.2d 1137, 1143 (D. Colo. 2004). "It is petitioner's burden to provide the Service with the necessary substantial scientific and commercial information." *Western Watersheds Project v. Norton*, No. 06-00127, 2007 WL 2827375, *2 (D. Idaho, Sept. 26, 2007)(Lodge, J.). The Plaintiffs seem to want the Court to ignore the statutory language of 16 U.S.C. § 1533(b)(3)(A) that requires the interested party's "petition" to contain substantial scientific or commercial information to warrant listing the species:

> To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553 (e) of title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, *the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted.* If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(Emphasis added).

In this case, the Secretary based his decision on the information provided within the four corners of the petition and supplemental materials, the literature cited in the petition, and evaluated that information in relation to other pertinent information available in the FWS files, so the Secretary clearly met its statutory burden for full consideration of an interested party's request to list a species.

Second, the facts of the *Defenders of Wildlife* case differ significantly from the facts of the case at bar. In *Defenders of Wildlife*, the Ninth Circuit held that the Secretary had not completed the requisite statutory review of whether the lizard at issue was "in danger of extinction through . . .a significant portion of its range." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1140 (9th Cir. 2001). In the present, case the Secretary did address in its 90-day finding whether the CSTG was "in danger of extinction through . . . a significant portion of its range" and determined that was not the case.

The ESA allows the Secretary to list an animal as endangered through all or a portion of its range. *Id.* at 1144. Ninety-five percent of the CSTG population is located in

ORDER - 9

the three metapopulation areas and the Plaintiffs' and FWS's data supports that the CSTG populations in the metapopulation areas is stable or more likely increasing. The remaining five percent of the CSTG population located in small, isolated pockets of the historical range may be decreasing and run the risk of future extinction in the near future, but the FWS found that any reduction in this small percentage of the population located on a small percentage of the total habitat area does not equal a "significant portion of the range."

The FWS also concluded the alleged threats to 95% of the CSTG population were not supported by the scientific and commercial information available which established that the three metapopulations are stable and/or increasing.

> **Significant Portion of the Range**
> The petition states that the Columbian sharp-tailed grouse is absent from 92 to 95 percent of its historic distribution (p.52 of the petition), and claims that this area represents a significant portion of the subspecies' range.
> We concur with the petitioners that the Columbian sharp-tailed grouse currently occupies less than 10 percent of its estimated historic distribution (Bart 2000, p. 8), and that most of the subspecies' small, isolated populations may be extirpated within 10 to 20 years due to existing threats and current management scenarios (Wisdom *et al.* 1998, pp. 305–313; Bart 2000, p. 9). However, range contractions by themselves do not relegate species to certain extinction or suggest that the species require protections under the Act. Nearly all species have experienced range contractions due to anthropogenic effects. While for many species even small range contractions are incompatible with recovery, reduction in a species' range or population numbers does not automatically suggest that the species is in peril, sometimes even when the reduction appears significant.
> Columbian sharp-tailed grouse population core areas, where 95 percent of the grouse have occurred for the last 50 years or more, have remained relatively constant, with recent slight increases (Bart 2000, pp.

8–10). Most broad-scale impacts to the Columbian sharp-tailed grouse (*e.g.*, loss and degradation of suitable habitats, over-hunting) that led to past declines in the subspecies' abundance and distribution took place during the late 1800s through the mid-1900s (Hart *et al.* 1950, pp. 55– 58; Buss and Dziedzic 1955, pp. 185– 187; Miller and Graul 1980, pp. 20–22; Marks and Marks 1987, pp. 1–4; Braun *et al.* 1994, p. 38; WDFW 1995, pp. 21– 27; McDonald and Reese 1998, p. 34; Connelly *et al.* 1998, pp. 2–3). The petitioner concludes that lack of proactive management by State and Federal agencies will allow the species to fade into extinction (p. 61 of the petition); however, available information shows that hunting is either regulated or not authorized in all States with populations, and reintroduction actions are ongoing. The subspecies remains stable in three metapopulations, and no current data indicates declining trends. The petition does not provide substantial information suggesting that the portion of the range where the subspecies no longer occurs is significant to the long-term persistence of the subspecies.

      In addition, while in general we are concerned with the continued loss of range and the potential contribution small populations may play in a species' recovery, the petition does not present substantial information that the small, islolated populations that may be extirpated in a few decades constitute a significant portion of the range. We made this determination based on a combination of factors. First, the extent of habitat outside the three metapopulations is small relative to the overall range of the subspecies, roughly 4 percent of the subspecies' current occupied range. Second, there is no scientific evidence suggesting that the small, isolated populations of Columbian sharp-tailed grouse are genetically, behaviorally, or ecologically unique, or that they contribute individuals to other geographic areas through emigration. Finally, there is no scientific evidence suggesting that these habitats are important to the survival of the species because of any unique contribution to the species' natural history, *e.g.*, for reasons such as feeding, migration, or wintering.

(AR 1, 7-8).

Third, the Court is not convinced by Plaintiffs argument that math calculations alone support further study or listing of the CSTG. While it is true CSTG have been extirpated from over 90% of the historical range for the CSTG, such extirpation did not occur since the 2000 12-month finding. Rather, the administrative record supports that

ORDER - 11

the extirpation occurred well before the ESA was enacted and was due to a multitude of factors.  While it is true that the reduction of the historical range must be considered, a reduction in a large percentage of the historical range does not per se justify listing the species under the ESA since the reduction occurred over 50 years ago and the CSTG population appears stable.   The Ninth Circuit states theat "the percentage of habitat loss that will render a species in danger of extinction or threatened with extinction will necessarily be determined on a case by case basis."  *Id.* at 1143.

Moreover, the Ninth Circuit specifically rejected the Plaintiffs argument in this case that the large reduction in historical range alone supports listing under the ESA.

> First, it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing.  A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of habitat.

*Id.*  Plaintiffs have failed to carry their burden that the historical loss of habitat creates a threat of extinction for the existing CSTG population when 95% of the CSTG population is concentrated in three metapopulations where the scientific data supports the FWS' conclusion the population is stable (and most likely growing even in metapopulation areas that allow hunting of CSTG) and should remain stable in the long-term future.

This Court can consider the scientific conclusions reached in 2000 valid since the 12- month finding was not challenged.  While Plaintiffs may disagree with the FWS' conclusions regarding the impact of the reduction of historical range, the time to challenge those decisions was when the 2000 12-month finding was issued, not now.  In

2006, the statute of limitations expired for any challenges to the 12-month finding issued in 2000 and that finding is presumed to be valid in all respects since it was not challenged within the applicable statute of limitations. *Weber v. Board of Harbor Commissioners*, 85 U.S. 57, 70 (1873).

For these reasons, the Plaintiffs' objections to the Report and Recommendation are denied.

## Conclusion

The Court has reviewed the 2004 petition and 2006 supplemental materials as well as the sources of information cited by the FWS in its 90-day finding and included in the Administrative Record. The Court respectfully disagrees with Plaintiffs that they have provided "substantial information" in their petition and supplemental materials to warrant listing or further study of the CSTG. The Court further finds the burden of providing substantial information to warrant listing was Plaintiffs when they filed their petition and supplemental materials. The Court finds the Secretary conducted the statutorily required review of the petition, cited literature in the petition and supplemental materials and evaluated such in light of the other information available in the FWS's files. The FWS considered each of the five factors set forth in the ESA separately and in combination to determine if the CSTG warrants listing due to alleged threats.

This Court is not allowed to substitute its judgment for the agency's judgment and the Court finds the administrative record supports the FWS' finding that the CSTG should not be listed at this time and the petition does not provide substantial information to

warrant a 12-month review. The Court also finds the decision of the FWS was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The Secretary's rejection of the Plaintiffs' petition was within the bounds of the ESA and the APA. Therefore, summary judgment should be granted in the Secretary's favor.

## Order

Because the Court finds the Report and Recommendation of Judge Boyle to be well founded in law, the Court hereby accepts in their entirety, and adopts as its own, the findings made by Judge Boyle. Acting on the recommendation of Judge Boyle, and this Court being fully advised in the premises,

**IT IS HEREBY ORDERED**:

1) Plaintiffs' Motion for Summary Judgment (Dkt. No. 35) is DENIED.

2) Defendant's Cross Motion for Summary Judgment (Dkt. No. 46) is GRANTED.

DATED: **March 28, 2011**

Honorable Edward J. Lodge
U. S. District Judge